UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
OLIVER WILLIAMS, MARGARETE GREEN,
and IRIS FILMER,

                                            Index No.:

           Plaintiffs,

-against-

THE NATIONAL GALLERY OF ART,              **COMPLAINT**
LONDON, THE AMERICAN FRIENDS
OF THE NATIONAL GALLERY OF ART,
LONDON, and GREAT BRITAIN, a/k/a
THE UNITED KINGDOM,

           Defendants.

-------------------------------------------------------X

       Plaintiffs Oliver Williams, Margarete Green and Iris Filmer, the legal heirs and assignee of a legal heir of Margarete Moll (together, the "Moll Heirs"), through their undersigned counsel, Rowland & Associates allege as follows:

### INTRODUCTION AND OVERVIEW

       1.    This action seeks to recover from The National Gallery of Art, London, ("National Gallery"), a public instrumentality of the British government wholly owned by Great Britain, a painting by the artist Henri Matisse entitled *Portrait of Greta Moll*, oil on canvas (1908) (hereinafter the "Painting").  The Painting was owned and lost by Margarete Moll ("Greta Moll"), the subject of the Painting, in the aftermath of World War II.

1



*Portrait of Greta Moll*, oil on canvas (1908)

2.      Greta Moll, who was concerned that the Painting might be lost or destroyed during the allied occupation of Germany due to looting by allied forces, including Russian troops who were known for their looting of art and other valuables, entrusted the Painting to Gertrud Djamarani, an art student of her husband, Oskar Moll, for the purpose of depositing it for her in Switzerland for safekeeping until she managed to leave Germany where she had lost her home and other belongings during the war.

3.      Instead, Djamarani took the Painting with her to Switzerland and converted it for her own account.

4.      Greta Moll never authorized Djamarani's actions or received any of the proceeds.

5.     Later, in 1949, the Painting was illegally acquired and imported into the United States by the Knoedler & Co. art gallery ("Knoedler") in New York City, who then sold it to Lee Blaffer in Texas.

6.     From Blaffer the Painting went to a private collection in Switzerland and from there to the Alex Reid & Lefevre Ltd. gallery (the "Lefevre Gallery") in London who sold it to the National Gallery in 1979.

7.     When the National Gallery bought the Painting from the Lefevre Gallery in London in 1979, it ignored the red flag that the painting had been transferred immediately after WWII and did not make any inquiries with the Moll family as to how Greta Moll lost possession of the Painting.

8.     On or about April 27, 2015, Plaintiffs, as the rightful owners, demanded the return of the Painting. The National Gallery explicitly refused the return of the Painting by letter dated September 21, 2015 to Plaintiffs' counsel in New York.

9.     By reason of section 4(3) of the Museums and Galleries Act 1992 of Great Britain, Plaintiffs are prevented from claiming the return of the Painting in a British court, as this act generally prohibits the disposal of objects that are the property of the National Gallery.

10.     Because the Moll Heirs lack a viable judicial remedy in Great Britain, they have brought this action to seek the return of the Painting. Their claims include conversion, replevin, constructive trust, restitution, as well as declaratory relief.

**THE PARTIES**

11.     Plaintiff Oliver Williams is a resident of Great Britain and is an heir of his mother Melita Williams, who was a daughter and heir of Greta Moll.  By way of inheritance, he is entitled to a 25% percent share of Greta Moll's estate.

3

12.     Plaintiff Margarete Green is a resident of Great Britain and an heir of her mother Melita Williams, who was a daughter and heir of Greta Moll.  By way of inheritance she is entitled to a 25% percent share of Greta Moll's estate.

13.     Plaintiff Iris Filmer is the daughter of Brigitte Wuerz who is a daughter and heir of Greta Moll. Brigitte Wuerz has a 50% share of the estate of Greta Moll. She has assigned her share to her daughter, Iris Filmer.

14.     Defendant, the National Gallery, is a public instrumentality of the British government which is wholly owned by the Great Britain. The National Gallery has a New York subsidiary, the American Friends of the National Gallery of Art, London ("AFNGA"), which is a not-for-profit corporation authorized to do business in the State of New York with a principal place of business at 275 Madison Avenue, 6th Floor, New York, New York 10016. Upon information and belief, the AFNGA has identical and interlocking directors with the National Gallery.

## JURISDICTION & VENUE

15.     This Court has subject matter and personal jurisdiction over the National Gallery pursuant to 28 U.S.C. §1330, because the National Gallery is not entitled to immunity under 28 U.S.C. §§ 1605-1607.  Process will be served on the National Gallery under 28 U.S.C §1608.

16.     Venue is proper in this district under 28 U.S.C. §1391(f)(1).

17.     This is the most convenient forum for this dispute.  Plaintiffs' action is barred by the section 4(3) of the Museums and Galleries Act 1992 of Great Britain, and therefore Plaintiffs have no adequate alternative forum to resolve this dispute.  The National Gallery has extensive New York connections. It has, *inter alia*, transported the Painting to New York, loaned and exhibited the Painting in New York, permitted the publication and sale of catalogues and

books with images of the Painting in New York, permitted and profited from the sales of such books and catalogues in New York and throughout the United States, has a New York subsidiary, which is authorized to do business in New York and has offices in New York County, where the subsidiary regularly solicits contributions through its dealings and contacts in New York on behalf of the National Gallery and sells books, publications, catalogues and posters through its New York website, which include images of the Painting.

### A.  The National Gallery is Not Immune From Suit Pursuant to 28 U.S.C. §1605(a)(2)(i)

18.      Under 28 U.S.C. § 1605(a)(2)(i), a foreign state–including its agencies and instrumentalities  like the National Gallery–shall not be immune from suit in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state."

19.      The claims of the Moll Heirs in this proceeding to recover the Painting are based upon the commercial activity of the National Gallery in New York and the United States within the meaning of the statute. The gravamen of Plaintiffs' claims is that Plaintiffs are the rightful owners of the Painting and the National Gallery's explicit refusal to return the Painting, which was made to Plaintiff's counsel in New York, as well as the National Gallery's transport and exploitation of the Painting in New York, violates international law and, New York law and Plaintiffs' possessory and ownership rights. The foregoing constitute commercial acts which gave rise to Plaintiffs' claim.

20.      On April 27, 2015, Plaintiffs' New York counsel sent a "Notification of Demand" to Dr. Susan Foister, Deputy Director of the National Gallery, demanding the return of the Painting to the Plaintiffs. (A copy of the April 27, 2015 letter is attached as Exhibit A.)  On September 21, 2015, the Director of the National Gallery, Dr. Gabriele Finaldi, sent a letter to Plaintiffs' New York counsel refusing to return the Painting to Plaintiffs. (A copy of the Sept. 21,

2015 letter is attached as Exhibit B.) This was a commercial activity of the National Gallery in New York as a museum communicating about its collection holdings within the meaning of 28 U.S.C. §1605(a)(2)(i). The foregoing act is clearly materially connected to Plaintiffs' cause of action for replevin and conversion, because it is this very act of refusal, *inter alia*, that gave rise to these causes of action.

21.     Moreover, the National Gallery, in violation of Plaintiffs' possessory and ownership rights: (i) transported and exploited the Painting in New York; (ii) loaned and exhibited the Painting in New York for monetary gain; (iii) permitted the publication, distribution and sale of books, catalogues and other merchandise bearing images of the stolen Painting in New York from which it profited therefrom; and (iv) sells books and other merchandise that contain images of the Painting in the New York market (see copies of excerpts of books attached as Exhibit C). The National Gallery's online store is promoted by its New York subsidiary, AFNGA, and the AFNGA also provides access through its website. AFNGA was established in New York solely for the purpose of supporting the National Gallery through New York contacts and commerce. AFNGA solicits donations and tourism for the National Gallery from residents of New York based upon the National Gallery's art collection, including the Painting.

22.     Plaintiffs' claims for conversion and replevin also have a close commercial nexus to New York and the United States in that they are grounded upon the governmental interests of New York and the United States in regulating the New York and United States art market. The negligent manner in which the National Gallery acquired the Painting from the Lefevre Gallery ignored any investigation as to whether the Painting may have been lost by Greta Moll and illegally brought into the New York and United States art market. The negligent acquisition of the Painting by the National Gallery thereby undermined the declared governmental interests of New York and

6

the United States in regulating and protecting the commercial viability of the New York and United States art market by encouraging prospective buyers to take responsible precautions against acquiring illicit, stolen or converted artworks which have been illegally brought into the New York and United States art market.

23.     The gravamen of Plaintiffs' complaint is that there is a causal relationship between the illegal importation of the Painting into New York and the Moll Heirs' claims against the National Gallery. The illegal importation of the stolen Painting into New York is part of the Painting's chain of title and is a material element of Plaintiffs' claims. Since Greta Moll never sold or authorized a sale of the Painting to anyone, no one in the chain of title after Greta Moll obtained good title to the Painting. The gravamen of Plaintiffs' claims are that by way the illegal importation of the Painting into New York, no one after Greta Moll in the chain of title obtained good title to the Painting, and the National Gallery's later acquisition of the Painting and commercial exploitation of it both within and outside of New York and the United States, and refusal (sent to Plaintiffs' attorney/agent in New York) to return it to the Moll Heirs, gives rise to the herein causes of action.

24.     The National Gallery's commercial activity in New York and the United States is substantial and the loss of the Painting and the National Gallery's illegal acquisition of it and commercial exploitation of it is integrally related to the National Gallery's commercial activities in New York and the United States.

**B.  Defendant Is Not Immune From Suit Pursuant to 28 U.S.C. § 1605(a)(2)(ii)**

25.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein. .

26.     Under 28 U.S.C. § 1605(a)(2)(ii), a foreign state – including its agencies and instrumentalities like the National Gallery – shall not be immune from suit in any case based upon "an act performed in the United States in connection with a commercial activity elsewhere."

27.     As stated, in response to Plaintiffs' demand for the return of the Painting, the National Gallery sent a letter to Plaintiffs' New York counsel refusing to return the Painting to Plaintiffs. This was an act performed by the National Gallery in New York in connection with their commercial activity as a collecting and exhibiting museum in Great Britain within the meaning of 28 U.S.C. § 1605(a)(2) (ii). This act is also clearly materially connected to Plaintiffs' claims, because the refusal to return the Painting to Plaintiffs, the rightful owners, is an essential element for establishing claims of conversion and replevin.

28.     Another material connection exists due to the illegal importation and acquisition of the Painting in New York by Knoedler and the claims of the Plaintiffs for conversion and replevin.  As related in the preceding paragraphs, the illegal acquisition and the taking of possession of the Painting by the Knoedler Gallery in New York was contrary to both New York and United States law and public policy with respect to the importation of illegally acquired property into New York and the United States.

29.     A causal relationship exists between the illegal importation of the Painting into New York by Knoedler and the Moll Heirs' claims against the National Gallery.  Knoedler's illegal importation of the Painting into New York is part of the Painting's chain of title and is a material element of Plaintiff's claims. Since Greta Moll never sold or delivered the Painting to Knoedler for sale, and therefore Knoedler never obtained good title from the Painting's true owner, the gravamen of Plaintiff's claims are that through its illegal importation of the Painting into New York  Knoedler never obtained good title to the Painting and therefore the National Gallery's later

acquisition of the Painting and commercial exploitation of it both within and outside of New York and the United States, and refusal to return it to the Moll Heirs, gives rise to the herein causes of action. Finally, the fact that the Painting was exhibited in New York, and images of it were sold in New York was in connection with a commercial activity that the National Gallery "performed elsewhere" within the meaning of the statute, i.e. the National Gallery's activity as a collecting and exhibiting museum in Great Britain. The National Gallery loaned the Painting into New York in its commercial function as a museum and sold or profited from the sale of exhibition catalogues, books, and posters containing images of the Painting in New York.

### C.  Defendant is Not Immune From Suit Pursuant to 28 U.S.C. § 1605(a)(2)(iii)

30.    Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein.

31.    Under 28 U.S.C. § 1605(a)(2)(iii), a foreign state—including its agencies and instrumentalities like the National Gallery—shall not be immune from suit in any case based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

32.    The misconduct of the National Gallery in first acquiring the Painting in violation of international law outside of the United States in London, then exhibiting the Painting in London and New York for profit and subsequently exploiting the image of the Painting both outside the United States and within the United States in New York through, *inter alia,* the transport and exhibition of the Painting in New York and the publication, distribution and sale of books, catalogues and other merchandise containing images of the Painting, coupled with the National Gallery's refusal to return the Painting has had a "direct effect" in the United States within

the meaning of this statute. It undermines the declared governmental interests of New York and the United States to prevent the New York art market from becoming a haven for illegally acquired art by denying commercially indifferent buyers a title clearing mechanism for laundering title to stolen and illegally converted artworks. By wrongfully refusing the demand of the Moll heirs to return the Painting, the National Gallery is seeking to validate its lack of due diligence with regard to its acquisition of the Painting in a manner that frustrates the declared governmental interests of New York State in regulating commercial conduct in the international New York art market.

33.     Further, by showing an illegally acquired painting in New York and using it to promote the National Gallery's art collection and general image, the National Gallery is misleading U.S. citizens by concealing the true provenance of the Painting and is collecting financial donations from U.S. citizens through the AFNG with the help of the Painting.

### D.  Defendant Is Not Immune From Suit Pursuant to 28 U.S.C. Sec. 1605(a)(3)

34.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein.

35.     Under 28 U.S.C. Sec. 1605(a)(3), a foreign state—including its agencies and instrumentalities like the National Gallery—is not immune from suit in any case in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

36.     A substantial amount of art was lost, looted and stolen both during and immediately after WWII. Examples of such illegal taking of art occurred due to actions of armed forces such as the Nazis, looting by soldiers both during and after WWII, and losses which occurred due to the upheavals of WWII, such as Greta Moll's loss of the Painting in the aftermath of WWII.

37.     Such losses, which are war related, are generally recognized by all countries to be losses in violation of international law. Countless examples of such losses exist. For example, U.S. service men stole artworks from museums and private homes in occupied Germany after WWII, and sent such artworks through the mail back to the United States where they were lost until later generations discovered them. Museums were looted in Iraq, both during and following the recent conflict there.

38.     In many such cases where war related looting and other losses occurred, the possessors of such property eventually did the right thing and returned the lost artworks to the states, institutions or private entities or individuals from whom they were illegally taken.

39.     In the case of the Painting, the National Gallery, has ignored the international legal standard that such war-related lost property should be returned to its true owners.

40.     In fact, the National Gallery, when confronted with the fact that the Painting had been lost in the aftermath of WWII, instead of returning the Painting in accordance with international legal, moral and ethical norms, has so far refused to return the Painting in violation of international law. This is despite the fact that Great Britain is a signatory of various international agreements which call for the return of cultural property lost, looted, stolen or otherwise taken due to war related circumstances. See Hague Convention of 1954, UNESCO Convention of 1970.

41.     In particular Article 3 of the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property 1970 ("UNESCO Convention") of which Great Britain is a signatory provides as follows: "The import, export or transfer of ownership of cultural property effected contrary to the provisions adopted under this Convention by the States Parties thereto, shall be illicit."

42.     Article 1(g)(i) of the UNESCO Convention defines cultural property as "…pictures, paintings and drawings produced entirely by hand…".

43.     Article 11 of the UNESCO Convention states: "The export and transfer of ownership of cultural property under compulsion arising directly or indirectly from the occupation of a country by a foreign power shall be regarded as illicit." At the time of the loss of the Painting, Germany was under occupation by the allied forces, including Great Britain.

44.     Article 7 of the UNESCO Convention requires Parties to it, such as Great Britain: "To take the necessary measures, consistent with national legislation, to prevent museums and similar institutions within their territories from acquiring cultural property originating in another State Party (here Germany) which has been illegally exported after entry into force of this Convention, in the States concerned."

45.     Article 13(a) of the UNESCO Convention requires its member states, including Great Britain: "to prevent by all appropriate means transfers of ownership of cultural property likely to promote the illicit import of such property"; and Article 13 (b) requires its member states: "to ensure that their competent services co-operate in facilitating the earliest possible restitution of illicitly exported cultural property to its rightful owner." Here Great Britain has not only utterly failed to prevent its instrumentality, the National Gallery, from acquiring the Painting which was lost during allied occupation after WWII, but it permitted the National Gallery

to acquire the Painting in contravention of Great Britain's obligations under the UNESCO Convention in violation of international law and its treaty obligations, and then to hold the Painting with impunity in contravention of its obligations to return it to its true owners the Moll Heirs, and has refused through its instrumentality, the National Gallery,  the just demands of the Moll Heirs for its return. All of these actions are in violation of international law and are directly contrary to Great Britain's obligations under the UNESCO Convention.

46.     Both Great Britain and its instrumentality the National Gallery knew or should have known, with minimal due diligence, that the Painting was such a war-related cultural loss, and that their acquisition of it was contrary to and in violation of international law.

47.     In addition to having acquired the Painting in violation of international law, the National Gallery does business in New York and the United States through its offices in New York and has commercially exploited the stolen Painting in New York and the United States through loaning the Painting into New York for exhibition purposes and further exploiting the painting by selling books, catalogues and other merchandise in New York and the United States.

48.     By reason of its unlawful acquisition of the Painting in violation of international law, its failure to compensate the Moll Heirs, the true owners of the Painting for their loss, and by reason of its refusal to return the illegally converted Painting to the Moll Heirs, subject matter jurisdiction exists under 28 U.S.C. Sec. 1605(a)(3) and the National Gallery is not immune to suit in the United States.

**E. Defendant Is Not Immune from Suit Pursuant to 28 U.S.C. Sec. 1605(a)(1)**

49.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein**.**

50.     Under 28 U.S.C. Sec. 1605(a)(1), a foreign state—including its agencies and instrumentalities like the National Gallery—is not immune from suit in any case in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver.

51.     By virtue of having entered into and ratified the UNESCO Convention, Great Britain and its instrumentality, the National Gallery, have agreed not to acquire cultural property lost or stolen in connection with wars, during occupation, or otherwise.

52.     In addition, Article 13(c) of the UNESCO Convention obligates its member states including Great Britain: "to admit actions for recovery of lost or stolen items of cultural property brought by or on behalf of the rightful owners."

53.     Such a clear treaty obligation agreed to by Great Britain for the benefit of third-party rightful owner claimants, such as the Moll Heirs, to "admit actions for recovery of lost or stolen items of cultural property brought by or on behalf of the rightful owners" constitutes a clear and explicit waiver of immunity by Great Britain. Even if the word waiver is not used, it is clear that meaning of this provision is to waive immunity in such cases as we have here.


## STATEMENT OF FACTS COMMON TO ALL ALLEGATIONS


**A. Greta Moll's Involuntary Loss of the Painting**

54.     The Painting was made by Henri Matisse in 1907-1908 when Oskar and Greta Moll were his art students in Paris. It is a portrait of Greta Moll, made after a number of sittings in 1907-1908 and was purchased by Oskar Moll from the artist in 1908.

55.     Following their Paris years, Oskar and Greta Moll lived in Breslau, Germany, and later lived in Dusseldorf when the Nazis rose to power and then later moved to Berlin. In 1933, Oskar Moll was dismissed from his position as a professor at the Dusseldorf Academy of Art. His art was considered "degenerate" and "bolshevist". The Nazis included Greta Moll's sculptures in the 1937 "Degenerate Art" exhibition in Munich. From 1933 on, Oskar and Greta Moll were prohibited by the Nazis from exhibiting their art in Germany. Articles in newspapers and art reviews defamed them as degenerate and bolshevist artists.  They lived in Berlin until 1943 when the city became subject to massive bombing attacks.

56.     In response, they decided to move to Oskar's parents' home in Silesia to be in the safe countryside. They stored some belongings, including the Painting, with friends in Thuringia. Greta Moll briefly returned to Berlin in 1944 only to see her house burned down to its foundation.

57.     In 1946, Greta and Oskar Moll were able to return to Berlin. Their close friend, the architect Hans Sharoun, gave them a room in a little apartment where they could stay for a while. They were able to recover the few belongings that were not destroyed in the war, which they had stored with their acquaintances in Thuringia. The Painting was one of the few items that had survived. Due to the upheaval after the war and the impending division of Berlin, they were compelled to follow their daughter, Melita Williams, who had married an Englishman, and moved to Wales, Great Britain. In order to protect the Painting from the danger of looting by allied troops and in particular from Russian troops who were known to have looted artworks and other valuables, they decided to have it sent to Switzerland for deposit with an acquainted art dealer for safekeeping.

58.     Due to the hardship of the war years, including near starvation, from which he never fully recovered, Oskar Moll died in 1947 and the Painting's ownership passed to his wife, Greta Moll, the subject of the painting.

59.     A former student of Oskar Moll, Gertrud Djamarani, who was preparing to emigrate to Iran, offered to take the Painting with her to Switzerland to deposit it with the art dealer. Djamarani took the Painting to Switzerland, but instead of giving it to the art dealer for safe keeping, converted it, kept the proceeds, and left for the Middle East. The Painting was hence illegally converted without the authorization of its owner, Greta Moll.

60.     Unbeknownst to Greta Moll, who had since moved to Wales in circa 1947/1948, and who had lost track of the Painting, it was illegally acquired and imported into the United States in 1949 by Knoedler in New York City. When Knoedler acquired the Painting, it would have had a high duty to inquire into its provenance as it is an art dealer. Knoedler, one of the most important dealers of European art in New York during that time, should have been aware of the provenance of the Painting. The Painting is a well-known masterpiece of Matisse's fauve period. Various publications on the work of Matisse mention the Painting and the fact that it belonged to Oskar Moll. The painting was prominently exhibited at the Museum of Modern Art in New York on the occasion of the big Matisse retrospective in 1931. In the exhibition catalogue the Painting is clearly mentioned as belonging to the collection of Oskar Moll. When Knoedler acquired the Painting it should have inquired into the circumstances of the transfer of title from Oskar Moll and Greta Moll, especially since neither of them was the seller. Because the Painting obviously changed possession in Europe in the aftermath of WW II, Knoedler's lack of due diligence regarding the Painting's ownership history, and shocking disregard of the legal rights of the Painting's true owner, Greta Moll, excludes them from bona fide purchaser protection. In

addition, since Knoedler did not acquire title from Greta Moll, the true owner of the Painting, neither Knoedler nor any of the Painting's subsequent owners, including the National Gallery, obtained good title to the Painting.

**B.  The National Gallery's Disregard of the Painting's Provenance**

61.     Contrary to its obligations under international law not to acquire cultural property lost or stolen during WWII and its aftermath, the National Gallery purchased the Painting from the Lefevre Gallery in London in 1979, two years after Greta Moll's death in 1977. In connection with this acquisition, the Lefevre Gallery provided the National Gallery with a provenance sheet for the Painting. (A copy of the provenance sheet is attached as Exhibit D.) The provenance sheet states that the Painting originally came from the collection of Oskar and Greta Moll and that it subsequently was with Knoedler & Co. in New York. This information alone should have alerted the National Gallery to undertake further research into the provenance. Especially because the provenance sheet notes that Oskar and Greta Moll owned the Painting until 1945, a date which should have triggered the museum's obligation for more extensive provenance research, and should have alerted them to the possibility that the Painting was lost or stolen during or after WWII, when the allies and Great Britain occupied Germany.

62.     In addition, the provenance sheet cited Greta Moll's February 1956 essay "Erinnerungen an Matisse" (Remembrance of Matisse), Neue Deutsche Hefte. This essay included a transcript of a lecture she gave in 1954, containing the following passage:

> [The Painting] became ours and we liked it better and better. We were able to keep it until the end of the Second World War - but as things go - we lost it afterwards.

63.     This information, cited to in the Lefevre provenance sheet clearly put the National Gallery on notice that the original owners of this Painting, Oskar and Greta Moll never transferred title to the Painting, but instead "lost" the Painting during Great Britain's occupation of Germany in the aftermath of WWII. The National Gallery had a duty to inquire into the provenance to make sure that there was no issue as to title and as to their obligations under international law not to acquire cultural property lost or stolen in the aftermath of WWII. The National Gallery apparently did not do so. Had it undertaken a reasonable inquiry into title, it would have been informed by the heirs of Greta Moll that the Painting had been lost in the aftermath of WWII and that Greta Moll had never transferred title to the Knoedler gallery or any subsequent purchaser.

**C. The National Gallery's Refusal To Return the Painting to the Moll Heirs**

64.     Contrary to its obligations under the UNESCO Convention and in violation of New York and international law, Great Britain and the National Gallery have to date not fulfilled their treaty obligations, which require them to turn the Painting to its rightful owners, the Moll Heirs.

65.     In particular on April 27, 2015, the Plaintiff's through their attorney and agent, Rowland & Associates, demanded the return of the Painting. (A copy of the demand letter is attached as Exhibit A.)

66.     The Moll Heirs demand for the return of the Painting was refused by Great Britain and the National Gallery by letter dated September 21, 2015.

67.     Plaintiffs now bring this action under the following causes of action.

## CLAIMS FOR RELIEF

### COUNT ONE
**(Declaratory Judgment)**

68.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein.

69.     Neither Djamarani nor any subsequent transferee obtained good title to the Painting, because Djamarani illegally converted the Painting without authorization from its true owner Greta Moll.

70.     Accordingly, the National Gallery could not and did not acquire good title to the Painting.

71.     At the time of the commencement of this action, Plaintiffs, as the heirs and assignees of rights to the Painting were the rightful owners of the Painting.

72.     There is an actual and justiciable controversy between Plaintiffs and the National Gallery with respect to the Painting, which requires immediate resolution.

73.     Plaintiffs have no adequate remedy at law.

74.     By reason of the foregoing, Plaintiffs are entitled to a judgment declaring that they are the owners of the Painting.

### COUNT TWO

**(Replevin)**

75.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein.

76.     The Painting is unique.  When the above-entitled action was commenced, and at all times relevant hereto, Plaintiffs were and still are the legal owners of the Painting, and have a superior possessory right to – and are entitled to the immediate possession of – the Painting. The value of the Paintings exceeds thirty million dollars ($30 million).

77.     The Painting is currently in the possession of the National Gallery. The National Gallery has wrongfully detained and withheld the Painting, and still detains the Painting in violation of the Plaintiffs' ownership rights and superior possessory interest.

78.     The National Gallery's detention of the Painting is wrongful for the reasons alleged herein. Before this action was commenced, Plaintiffs, through their attorneys, demanded that Defendant return the Painting. Defendant refused the demand on or about September 21, 2015.

79.     The National Gallery's wrongful detention and withholding of the Painting has caused Plaintiffs heirs to sustain damages in an amount exceeding thirty million dollars ($30 million).

## COUNT THREE

### (Conversion)

80.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein.

81.     At all times relevant hereto, the law has prohibited any person from wrongfully detaining property that belongs to another or in which another person has a superior legal possessory interest. When the possessor of such property refuses the demand of a person with a superior possessory interest in such property to return it, the law makes the wrongful possessor of such property liable to the other for conversion.

82.     At all times relevant to this proceeding, and for the reasons stated herein, Plaintiffs have been the rightful owners of the Painting, and have had a legal possessory interest in the Painting that is superior to the National Gallery.

83.     Before this action was commenced, Plaintiffs, demanded that the National Gallery return the Painting. The National Gallery refused the demand on or about September 21, 2015.

84.     The National Gallery has wrongfully detained and withheld the Painting in violation of Plaintiff's ownership rights and superior legal possessory interest, and has wrongfully refused to return it. The National Gallery's wrongful conversion of the Painting has caused Plaintiffs damages in an amount exceeding thirty million dollars ($30 million).

## COUNT FOUR

### (Restitution Based Upon Unjust Enrichment)

85.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein.

86.     At all times relevant to this proceeding, the law has prohibited persons from being unjustly enriched by receiving and holding property that lawfully belongs to another, and which in good conscience they cannot retain. At all times relevant to this proceeding, the law has required persons in possession of such property to return it to the rightful owner to prevent their unjust enrichment, and has afforded the equitable remedy of restitution to accomplish this objective.

87.     WWII, which inflicted massive economic and financial losses upon the Moll family and the occupation of Germany by allied troops, including Russian troops who were known for their looting of art and other valuables, was the reason that Greta Moll was compelled

to send the Painting to Switzerland due to the fear that she would also suffer the additional loss of the Painting if it remained in Germany. Djamarini disregarded Greta Moll's instructions and exploited the opportunity of Moll's hardship by illegally converting the Painting for her own account in an unauthorized conversion.

88.     When the National Gallery acquired the Painting from Lefevre it did not bother to ask the Moll family about the history of the Painting despite it being a portrait of its owner, Greta Moll, and despite having been informed by Lefevre's provenance information sheet that it changed hands in the aftermath of WWII. Had Defendant made a few appropriate inquiries at the time – which Defendant indifferently and unreasonably neglected to do – Defendant would have become aware that the Painting was illegally converted.

89.     Under the above circumstances the Moll Heirs are entitled to impose a constructive trust for their benefit upon the Painting to prevent the National Gallery's unjust enrichment, and the National Gallery should be required to disgorge all monies, profits and gains which they have obtained or will unjustly obtain in the future at the expense of the Moll Heirs.

## COUNT FIVE

### (Constructive Trust)

90.     Plaintiffs repeat, reiterate and re-allege each and every allegation contained in this complaint as if set forth fully herein.

91.     At all times relevant to this proceeding, the law has prohibited persons from holding property which in good conscience they ought not to enjoy, and has imposed a constructive trust upon such property for the benefit of the person who lawfully is entitled to its possession. The law provides the equitable remedy of constructive trust in such instances and whenever necessary to satisfy the demands of good conscience and justice.

22

92.     The National Gallery obtained the Painting in 1979 in a manner that was casually indifferent to the material possibility that the Painting had been lost and illegally converted in the aftermath of WWII. The National Gallery has continued to wrongfully detain the Painting despite the just demand of the Moll heirs for its return.

93.     As a result, the Moll heirs are entitled to a constructive trust being imposed upon the Painting currently in the possession of the National Gallery for their benefit, obligating the National Gallery to return the Painting or to compensate them for its loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek:

a.     an order declaring that Plaintiffs are the owners of the Painting;

b.     an order directing Defendants to return to Plaintiffs the Painting or to pay compensation therefore in an amount to be proven at trial, but not less than thirty million dollars ($30,000,000) together with pre-judgment and post judgment interest thereon;

c.     an order imposing a constructive trust over the Painting, and directing Defendants to deliver to Plaintiff possession of the Painting;

d.     an order awarding Plaintiff reasonable attorneys' fees and costs; and

e.     an order granting such other and further relief as the Court deems just and proper.

Dated: New York, September 6, 2016

TIAJOLOFF & KELLY LLP

By:  s/Edward P. Kelly

Edward P. Kelly, Esq.
The Chrysler Building 37th floor
405 Lexington Avenue
New York, New York 10174

(212) 490-3285 (Tel.)
(212)-490-3295 (Fax)
ekelly@tkiplawcom


ROWLAND & ASSOCIATES

By: s/David J. Rowland

David J. Rowland, Esq.
2 Park Avenue, 19th Floor
New York, NY 10016
(212) 685-5509 (Tel.)
(212)-685-8862 (Fax)
David.Rowland@rowlandlaw.com
`

Attorneys for Plaintiffs