USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____9/21/17___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
OLIVER WILLIAMS, IRIS FILMER, and :
MARGARETE GREEN, :
                                            :
                          Plaintiffs, :            16-CV-6978 (VEC)
                                            :
                  -against- :            MEMORANDUM
                                            :          OPINION & ORDER
THE NATIONAL GALLERY OF ART, :
LONDON; THE AMERICAN FRIENDS OF THE :
NATIONAL GALLERY, LONDON, INC; and :
GREAT BRITAIN, :
                                            :
                          Defendants. :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        Plaintiffs Oliver Williams, Iris Filmer, and Margarete Green, heirs of Margaret Moll

("Greta Moll" or "Greta"), seek to recover from the National Gallery, London (the "National

Gallery" or the "Gallery"), a painting by Henri Matisse entitled *Portrait of Greta Moll*

("Painting").  Greta Moll owned the Painting but lost it in the aftermath of World War II.  After

passing through the hands of various owners, the Painting became part of the National Gallery's

collection.  Defendants the National Gallery and the American Friends of the National Gallery,

London Inc. (the "American Friends," and collectively, "Gallery Defendants") have moved to

dismiss Plaintiffs' Amended Complaint arguing primarily that the National Gallery is immune

pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, *et seq.* ("FSIA").[1]

Defendant Great Britain has moved separately to dismiss the Amended Complaint, also primarily

---

[1] The National Gallery is a public instrumentality wholly owned by Great Britain.  Am. Compl. ¶ 16 (Dkt. 17).

on foreign sovereign immunity grounds.  For the following reasons, Defendants' motions are

granted.

## BACKGROUND[2]

Greta Moll and her husband Oskar were art students of Henri Matisse.  Am. Compl. ¶ 51.

Oskar Moll commissioned Matisse to paint a portrait of Greta, and he purchased the portrait from

Matisse in 1908.  *Id.*  The Molls lived in Berlin when World Word II started, and they and the

Painting survived the war.  *Id.* ¶¶ 52-54.  In 1946, due to the upheaval after the war and the

impending partition of Berlin, the Molls decided to move to Wales, where their daughter had

moved previously.  *Id.* ¶ 54.  In order to protect the Painting from looting, the Molls decided to

send it to Switzerland for deposit with an art dealer.  *Id.*  Oskar's former student, Gertrude

Djamarani, who was preparing to emigrate to Iran, offered to take the painting with her to

Switzerland.  *Id.* ¶ 55.  Before that could happen, Oskar died, and Greta became the owner of the

Painting.  *Id.* ¶ 56.

Following Oskar's death in 1947, Greta gave the Painting to Djamarani to take to the

Swiss art dealer, but Djamarani illegally converted the Painting, by sale or by otherwise taking

money for it, and kept the proceeds, without Greta's authorization or knowledge.  *Id.* ¶ 57.

Greta, who had moved to Wales, lost track of the painting.  *Id.* ¶ 58.  In 1949, Knoedler & Co.

("Knoedler"), an art gallery in New York City, acquired the Painting and imported it to New

York.  *Id.* ¶¶ 5, 58.  Plaintiffs allege that Knoedler lacked good title to the Painting because it did

not conduct proper due diligence given that the Painting was famous, was known to have been

owned by Oskar Moll, and was coming from post-war Europe  *Id.* ¶ 59.  Moreover, the U.S.

---

[2]    In deciding the motions to dismiss, the Court accepts as true the facts alleged in the Amended Complaint
and draws all reasonable inferences in Plaintiffs' favor.  *Koch v. Christie's Intern, PLC*, 699 F.3d 141, 145 (2d Cir.
2012).

government had issued warnings to art dealers that it was seeking to return art that had been looted in war areas and that no clear title could be passed on property that had been looted abroad. *Id.* ¶¶ 6, 59. After Knoedler, the Painting had several owners: Knoedler sold the Painting to Lee Blaffer in Texas; Blaffer sold it to a private collection in Switzerland; and the Swiss collector sold it to the Alex Reid & Lefevre Ltd. gallery ("Lefevre Gallery") in London. *Id.* ¶¶ 5, 8. In 1979, two years after Greta had died, the Lefevre Gallery sold the Painting to the National Gallery. *Id.* ¶¶ 8, 60.

At some point after 1979, Plaintiffs informed the National Gallery that the Painting had been stolen from Greta Moll and provided allegedly supporting documentation.[3] *Id.* ¶¶ 61-62. After unsuccessful discussions with the National Gallery, on March 14, 2014, Plaintiffs filed a request with Britain's Spoliation Advisory Panel ("SAP"), an administrative body tasked with deciding Holocaust era art claims, for the return of the Painting. *Id.* ¶ 63. On March 25, 2015, SAP decided that it lacked jurisdiction to adjudicate Plaintiffs' request because the Painting was lost in 1947, and its jurisdiction covers only the Nazi era, which ended in 1945. *Id.* ¶ 64. On April 27, 2015, Plaintiffs, as the alleged rightful owners of the Painting, demanded its return from the National Gallery. *Id.* ¶¶ 10, 22, 65. On September 21, 2015, the National Gallery notified Plaintiffs' counsel by letter sent to New York that it refused to return the Painting. *Id.* ¶¶ 10, 22, 66.

The next year, on September 6, 2016, Plaintiffs initiated this lawsuit. Dkt. 1. Plaintiffs' claims include conversion, replevin, constructive trust, restitution based upon unjust enrichment,

_____

[3] Plaintiffs do not allege in their Amended Complaint the date on which Plaintiffs first contacted the National Gallery or the date on which they first learned that the National Gallery had the Painting. As discussed *infra*, Defendants present evidence that Plaintiffs began communicating with the Gallery regarding ownership of the Painting in 2011 and that at least one of Plaintiffs' ancestors knew that the painting was at the National Gallery as of the late 1970s or early 1980s.

and declaratory relief. Am. Compl. ¶¶ 12, 68-93. Because the National Gallery, a public instrumentality of Great Britain, and Great Britain are foreign sovereigns, the Foreign Sovereign Immunities Act applies to Plaintiffs' claims against those entities. Plaintiffs have also sued the American Friends, a U.S. not-for-profit with its principal place of business in New York, which operates for the benefit of the National Gallery. *Id.* ¶ 16. Plaintiffs assert that American Friends is the alter ego of the National Gallery. *Id.* On April 5, 2017, this case was reassigned to the Undersigned. The Gallery Defendants and Great Britain moved to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on February 13, 2017, and May 8, 2017, respectively.[4] Dkts. 28, 38.

## DISCUSSION

### I. The National Gallery and Great Britain Are Immune Under the Foreign Sovereign Immunities Act

#### A. Legal Standard

FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). FSIA defines a "foreign state" to include its "agenc[ies] and instrumentalit[ies]," 28 U.S.C. § 1603(a), such as the National Gallery. Pursuant to FSIA, "a foreign state shall be immune from the jurisdiction of the United States and of the States," subject to specific exceptions. 28 U.S.C. § 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Plaintiffs allege that three exceptions apply here: (1) the expropriation exception, which limits immunity in certain actions involving "property taken in violation of international law," 28 U.S.C.

---

[4] The Court must consider the 12(b)(1) motion first "because a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Magee v. Nassau Cty. Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998) (citing *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)).

§ 1605(a)(3); (2) the commercial activity exception, which limits immunity in certain actions that are "based upon" commercial activities carried out by the foreign state, 28 U.S.C. § 1605(a)(2); and (3) the waiver exception, which limits immunity in any case "in which the foreign state has waived its immunity," 28 U.S.C. § 1605(a)(1).

"Questions of FSIA subject-matter jurisdiction are resolved through a three-part burden shifting framework." *Arch Trading Corp. v. Republic of Ecuador*, No. 13 CV 4445 (PAC), 2015 WL 3443906, at *2 (S.D.N.Y. May 28, 2015) (citing *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 242 (2d Cir. 2002)), *aff'd,* 839 F.3d 193 (2d Cir. 2016). "In a motion to dismiss on FSIA grounds, the movant must first make a prima facie showing that it is a 'foreign state' under the Act."[5] *Freund v. Republic of France*, 592 F. Supp. 2d 540, 552 (S.D.N.Y. 2008), *aff'd sub nom. Freund v. Société Nationale des Chemins de fer Francais*, 391 F. App'x 939 (2d Cir. 2010). The plaintiff then "has the burden of going forward with evidence showing that, under exceptions to FSIA, immunity should not be granted." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993). "[T]he ultimate burden of persuasion remains with the alleged foreign sovereign." *Id.*

"In the context of a Rule 12(b)(1) challenge to jurisdiction under FSIA . . . the district court 'must look at the substance of the allegations' to determine whether one of the exceptions to FSIA's general exclusion of jurisdiction over foreign sovereigns applies." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (quoting *Cargill Int'l*, 991 F.2d at 1019). To do so, "the district court must review the pleadings and any evidence before it, such as affidavits." *Cargill*, 991 F.2d at 1019. Although a district court does not decide the merits of the case in

---

[5]    Plaintiff concedes that Great Britain and the National Gallery are foreign sovereigns under FSIA.

order to decide jurisdiction, it "may examine the defendant's activities to determine whether they confer subject matter jurisdiction on the federal courts." *Robinson*, 269 F.3d at 141-42.

## B. Expropriation Exception

To establish subject matter jurisdiction pursuant to the expropriation exception of FSIA, a plaintiff must demonstrate the following:

> (1) that rights in property are at issue;
>
> (2) that the property was "taken";
>
> (3) that the taking was in violation of international law; *and either*
>
> (4)(a) "that property . . . is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," *or*
>
> (b) "that property . . . is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]"

*Garb v. Republic of Poland*, 440 F.3d 579, 588 (2d Cir. 2006) (alterations in original) (quoting 28 U.S.C. § 1605(a)(3)). As the *Garb* court's emphasis makes clear, the fourth element of the taking exception is disjunctive. Here, Plaintiffs proceed only pursuant to the "4(b)" provision of the fourth element because the Painting is not in the United States. The parties dispute whether Plaintiffs have satisfied several of these elements, including: (1) whether the Painting was "taken," as defined by FSIA; (2) whether the Painting was taken in violation of international law; and (3) whether the National Gallery engages in commercial activity in the United States sufficient to satisfy FSIA. Because the Painting was not "taken" as defined by FSIA, the expropriation exception does not apply, and the Court need not address the other disputed issues regarding the expropriation exception.

FSIA does not define the term "taken," but the legislative history is unambiguous that "taken in violation of international law" refers to "the nationalization or expropriation of

property without payment of the prompt adequate and effective compensation required by international law." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000) (quoting H.R. Rep. No. 94–1487, at 19 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6618). The Second Circuit has held that the legislative history makes clear that the term "taken" "refers to acts of a sovereign, not a private enterprise, that deprive a plaintiff of property without adequate compensation." *Id*; *see also Orkin v. Swiss Confederation*, 770 F. Supp. 2d 612, 617 (S.D.N.Y.) (no subject matter jurisdiction under FSIA takings clause because the case involved an acquisition by a private individual), *aff'd*, 444 F. App'x 469 (2d Cir. 2011). The alleged illegal conversion of the Painting in the immediate post-war years was not a taking pursuant to FSIA because it was Djamarani, a private individual, who allegedly illegally converted the Painting. No sovereign was responsible for the illegal conversion of the Painting.

Because conversion by a private individual is not a FSIA taking, Plaintiffs' theory is that a taking pursuant to FSIA occurred when the National Gallery refused to return the Painting to Plaintiffs. Am. Compl. ¶¶ 38, 44; Pls. Opp. 11-13.[6] The National Gallery's refusal to return the Painting was not, however, a taking pursuant to FSIA. "As with any question of statutory interpretation, [the Court] start[s] with the text." *Doe v. Bin Laden*, 663 F.3d 64, 66 (2d Cir. 2011). "To take" has many definitions, but the one applicable here is "to get into one's hands or into one's possession, power, or control," such as "to seize or capture physically" or "to acquire by eminent domain." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/take (last visited September 20, 2017). What the National Gallery has

---

[6] The Court cites to the parties' briefs as the following: Gallery Defendants' Memorandum of Law in Support of Motion to Dismiss First Amended Complaint (Dkt. 30) is "Gallery Defs. Mem."; Plaintiffs' Memorandum of Law in Opposition to [Gallery] Defendants' Motion to Dismiss (Dkt. 32) is "Pls. Opp."; and Gallery Defendants' Reply Memorandum in Further Support of Motion to Dismiss First Amended Complaint (Dkt. 35) is "Gallery Defs. Reply."

done is to refuse to return property. To refuse to return property is not to get property into one's possession or control but, rather, having previously acquired control, to retain the property despite a request that it be transferred to another. The act of taking occurs before and is independent of the act of refusing to return; the two acts are distinct. FSIA covers takings—i.e., seizures—of property by sovereigns in violation of international law; it does not cover a sovereign retaining property initially taken by a private individual.

To interpret FSIA otherwise would contravene Congress's intent. "The broad purposes" of FSIA were "to facilitate and depoliticize litigation against foreign states and to minimize irritations in foreign relations arising out of such litigation." H.R. Rep. 94-1487, at 45, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6634. When Congress enacted FSIA in 1976, it intended to codify a "restrictive" theory of sovereign immunity that had been the State Department's policy since 1952; the theory provided that foreign sovereigns would be immune with respect to public acts of state but not with respect to acts that were commercial in nature or those which private persons normally perform. *Garb*, 440 F.3d at 585-86; *see also* H.R. Rep. No. 94–1487, at 14. In codifying the restrictive theory, Congress designated limited, specific cases in which a foreign sovereign would not be immune. *See Garb*, 440 F.3d at 585-86. One of these limited exceptions is for cases concerning property "taken in violation of international law," which, as explained *supra*, refers to "the nationalization or expropriation of property." *Zappia Middle E. Const. Co.*, 215 F.3d at 251 (quoting H.R. Rep. No. 94–1487, at 19, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6618). An expropriation is "[a] governmental taking [i.e., seizure] or modification of an individual's property rights." *Black's Law Dictionary* (10th ed. 2014). Congress fashioned the expropriation exception, as well as FSIA's other exceptions to sovereign immunity, based on accepted principles of international law. *See* H.R. Rep. 94-1487, at 14, *reprinted in* 1976

U.S.C.C.A.N. 6604, 6613 (explaining that FSIA is a "statutory regime which incorporates standards recognized under international law" and noting the "wide acceptance [in international law] of the so-called restrictive theory of sovereign immunity"); *Altmann v. Republic of Austria*, 317 F.3d 954, 967 (9th Cir. 2002) ("[The expropriation] exception to foreign sovereign immunity is based upon the general presumption that states abide by international law and, hence, violations of international law are not 'sovereign' acts." (internal quotation marks and citation omitted)), *opinion amended on denial of reh'g*, 327 F.3d 1246 (9th Cir. 2003), *and aff'd on other grounds*, 541 U.S. 677 (2004).[7]

To adopt Plaintiffs' argument and to hold that a foreign sovereign's refusal to return property stolen by a private individual is a taking pursuant to FSIA would drastically broaden Congress's carefully crafted expropriation exception. Adopting Plaintiffs' interpretation of the expropriation exception would not only defy Congress's intent to limit and specifically define the expropriation exception but it would also deviate from the exceptions to sovereign immunity generally recognized by international law that Congress sought to codify in FSIA. Because the interpretation for which Plaintiffs advocate would significantly expand the expropriation exception, it would undermine Congress's goal to minimize irritations in foreign relations arising out of litigation. To the extent FSIA's expropriation exception is ambiguous (which it is not), courts "ordinarily construe[] ambiguous statutes to avoid unreasonable interference with the

---

[7]     *See also Trajano v. Marcos (In re Estate of Marcos Human Rights Litig.),* 978 F.2d 493, 497-98 (9th Cir. 1992) ("Congress intended the FSIA to be consistent with international law . . . ."); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 310 (2d Cir. 1981) ("[T]he [FSIA's] drafters seem to have intended rather generally to bring American sovereign immunity practice into line with that of other nations."), *overruled on other grounds by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009); *Martropico Compania Naviera S.A. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 428 F. Supp. 1035, 1037 (S.D.N.Y. 1977) (The primary purpose of FSIA is to "provide[ ] a unitary rule for determinations of claims of sovereign immunity in legal actions in the United States, thereby . . . bringing the United States into conformity with the immunity practice of virtually every other country.").

sovereign authority of other nations." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004).[8] Moreover, as the Ninth Circuit noted in response to the argument that unintended and bizarre consequences will occur if § 1605(a)(3) is interpreted to grant jurisdiction against foreign entities without regard to who did the expropriation or when it occurred, "jurisdictional boundaries are for Congress to set, not for courts to write around." *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1031 (9th Cir. 2010). This Court, like all others, is bound to exercise its jurisdiction as defined by FSIA's expropriation exception, and it would surpass that jurisdictional boundary if it adopted Plaintiff's expansive interpretation of the expropriation exception.

Plaintiffs point to *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298 (D.D.C. 2005), to support their argument that the National Gallery's refusal to return the Painting is a taking pursuant to FSIA. Pls. Opp. 11-12. But *Malewicz* does not support Plaintiffs' argument. In *Malewicz*, the plaintiffs were heirs of the Russian abstract artist Kazimir Malewicz, who was world renowned in the years before World War II, and they sought the return of his artwork from the City of Amsterdam, a political subdivision of the Kingdom of the Netherlands. 362 F. Supp. 2d at 300-301. Malewicz's friend had held his artwork for safekeeping in Germany because such artwork was condemned in Stalinist Russia. *Id.* at 301. After Malewicz died, his friend continued to hold the art in safekeeping as a custodian, but a museum in Amsterdam negotiated the sale of the artwork with full knowledge that Malewicz's friend did not have the legal right to sell it. *Id.* at 302-303. The museum allegedly coordinated with a German lawyer to create fraudulent documents establishing that Malewicz's friend had legal authority to transfer

---

[8]      *See also F. Hoffmann-La Roche Ltd.*, 542 U.S. at 164 ("This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony . . . .").

ownership of the artwork. Decl. of Sarah E. André in Support of Reply ("André Decl. II") Ex. A

(Amended Complaint filed in *Malewicz v. City of Amsterdam*, No. 04-cv-00024 (D.D.C.), Dkt.

No. 4) ¶¶ 26-34 (Dkt. 35-2).[9] According to the *Malewicz* complaint, "Amsterdam knowingly

conspired to 'purchase' the Malevich collection through an unlawful transaction that was null

and void . . . ." *Id.* ¶ 39. Decades later, Malewicz's heirs learned that his work was at the

museum in Amsterdam and requested its return from the City of Amsterdam, but the City refused

to return the artwork. 362 F. Supp. 2d at 303. The court denied the City of Amsterdam's motion

to dismiss for lack of jurisdiction, finding that it did not have enough information before it to

decide whether the City of Amsterdam's contacts with the United States satisfied the

expropriation exception. *Id.* at 309-10.

In contrast with this case, the foreign sovereign in *Malewicz*—the museum in

Amsterdam—allegedly conspired to take the artwork from Malewicz's friend, who was its

lawful custodian. It was the foreign sovereign that committed the taking in the first instance (by

conspiring with the German lawyer), which are not the facts currently before this Court.

Plaintiffs' theory in that case was that the museum's fraudulent acquisition of the art was a

taking. Plaintiffs alleged explicitly that the artwork was taken in violation of international law

because "the purported *'purchase'* of the Malevich Collection from [Malewcz's friend] failed to

compensate its rightful owners." André Decl. II Ex. A ¶ 40 (emphasis added). Although the

plaintiffs alleged that the City's refusal to return the Painting on the basis that the museum

acquired good title pursuant to Dutch law constituted an additional taking,[10] *id.*, the court in

---

[9]    The Court may take judicial notice on a motion to dismiss of filings in state or federal court, such as the *Malewicz* complaint. *Purjes v. Plausteiner*, No. 15-CV-2515 (VEC), 2016 WL 552959, at *4 (S.D.N.Y. Feb. 10, 2016).

[10]    Plaintiffs also alleged that the City of Amsterdam's refusal to return the art "gave final effect to the wrongful taking of the Malevich Collection in violation of international law." André Decl. II Ex. A ¶ 43.

*Malewicz* made no finding that the museum's refusal to return the artwork was a taking in accordance with FSIA. Indeed, the court did not analyze what constitutes a taking at all but instead addressed whether plaintiffs were required to exhaust their remedies in the Netherlands, whether the artwork satisfied the FSIA requirement that the art be present in the United States, and whether the City of Amsterdam had satisfied FSIA's commercial activity requirement. *Malewicz*, 362 F. Supp. 2d at 306-315. Regarding the City of Amsterdam's refusal to return the art, the court only noted in the context of addressing whether plaintiffs were required to exhaust their remedies in the Netherlands that the refusal was "in the nature of a legal defense only," not a denial of responsibility for its acquisition of the Malewicz artwork. *Id.* at 308. This observation refutes the notion that the *Malewicz* court considered the City's refusal itself— independent of the museum's fraudulent purchase—to be the required taking.[11]

For all these reasons, there has been no taking in violation of international law as required by FSIA, and the Court does not have jurisdiction over the National Gallery and Great Britain pursuant to FSIA's expropriation exception.

### C. Commercial Activity Exception

FSIA's commercial activity exception provides that a foreign sovereign is not immune from the jurisdiction of a U.S. court when the "action is based upon":

(1) a commercial activity carried on in the United States by the foreign state; or upon

(2) an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon

---

[11] Plaintiffs also point to *Orkin v. Swiss Confederation*, 444 F. App'x 469 (2d Cir. 2011) (summary order), in support of their argument. Pls. Opp. 12-13. In *Orkin*, the Second Circuit noted that, during oral argument, plaintiff asserted that a taking had occurred when the Swiss Federation denied plaintiff's claim as the true owner of a Van Gogh drawing and retained the drawing, even though the drawing was initially taken from the rightful owner by a private individual. *Id.* at 471 n.1. The Second Circuit's decision in *Orkin* does not lend support to Plaintiffs' argument in this case as the Circuit "express[ed] no opinion as to the merits of this alternative argument" because plaintiff raised it for the first time during oral argument. *Id.*

(3) an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

*Garb*, 440 F.3d at 586 (quoting 28 U.S.C. § 1605(a)(2)).  Plaintiffs allege that this Court has jurisdiction pursuant to the first two subsections.  Plaintiffs, however, satisfy neither of the subsections because Plaintiffs' claims are not "based upon" commercial activity.

"The Supreme Court has explained that, within the meaning of § 1605(a)(2), 'an action is based upon the particular conduct that constitutes the 'gravamen' of the suit.'" *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107 (2d Cir.) (quoting *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015)), *cert. denied sub nom. Sovereign Wealth Fund Samruk-Kazyna JSC v. Atl. Holdings, Inc.*, 137 S. Ct. 493 (2016).  The "gravamen" of a suit is the "basis" or "foundation" of a claim, "those elements . . . that, if proven, would entitle a plaintiff to relief."  *Sachs*, 137 S. Ct. at 395 (alteration in original) (quoting *Saudi Arabia*, 507 U.S. at 357).  To determine the gravamen of the suit, the court should not individually analyze each cause of action but instead "zero[] in on the core" of the suit, namely the sovereign acts that allegedly injured the plaintiff.  *Id.* at 396.

"As a threshold step in assessing plaintiffs' reliance on the 'commercial activity' exception, [the court] must identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims."  *Garb*, 440 F.3d at 586.  The core of Plaintiffs' suit is that the National Gallery lacks good title to the Painting due to Djamarani's alleged theft, and the National Gallery has therefore wrongfully refused to return the Painting.  As to the first subsection of the commercial activity exception, the gravamen of Plaintiffs' suit in no way concerns commercial activity carried out in the United States by the National Gallery or by Great Britain.  The National Gallery acquired the Painting from the Lefevre Gallery in London, Am. Compl. ¶¶ 8,

60, and the Painting is currently being retained (allegedly wrongfully) in London. Nothing about determining who has proper title to the Painting or determining whether the National Gallery is wrongfully withholding the Painting concerns commercial activity carried out in the United States by the National Gallery or Great Britain. As to the second subsection of the commercial activity exception, in order for there to be jurisdiction, Plaintiffs' action must be "based upon" "an act performed in the United States in connection with a commercial activity of [the National Gallery or Great Britain] elsewhere." 28 U.S.C. § 1605(a)(2). Again, nothing about determining who has proper title to the Painting or determining whether the National Gallery is wrongfully withholding the Painting depends upon an act performed in the United States in connection with the National Gallery's or Great Britain's commercial activity elsewhere. The Painting may have changed hands in the United States after Djamarani illegally converted it and before the National Gallery acquired it, and it may have been loaned to a museum in the United States by the National Gallery, but those acts performed in the United States are not part of the "gravamen" or "foundation" of Plaintiffs' suit.[12]

Plaintiffs argue that the commercial activity exception is satisfied because their suit is based upon the following commercial activities: (1) the National Gallery's commercial activities in the United States, including the incorporation and operation of the American Friends; (2) the publication of images of the Painting in the United States via catalogues and other means and the loan of the Painting from the National Gallery to a museum in New York; and (3) the National Gallery's letter to Plaintiff's counsel in New York refusing to return the Painting. Pls. Opp. 20-21. Plaintiffs further argue that their suit is based on the National Gallery's commercial activities in the United States because the exhibition of the Painting in New York and the

---

[12]     In addition, the transfer in ownership to and from Blaffer in the United States is not connected to commercial activity of the National Gallery or Great Britain.

publication of catalogues containing images of the Painting "goes directly to the question of valid title and Defendants' unjust enrichment by wrongfully asserting a position of ownership . . . ." *Id.* at 21. In addition, Plaintiffs contend that their suit is based upon the National Gallery's refusal to return the Painting via a letter sent to Plaintiffs' counsel in New York because it triggered the accrual of Plaintiffs' conversion and replevin claims. *Id.* at 21-22. The letter sent to Plaintiffs' counsel is purportedly both a commercial activity carried out in the United States and an act performed in the United States in connection with the National Gallery's commercial activities in Great Britain. *See id.* at 20.

The problem with Plaintiffs' argument is that Plaintiffs' suit is not based or founded upon any of those alleged acts. The operations of the American Friends, the sale of catalogues containing images of the Painting, and the loan of the Painting to a New York museum are wholly irrelevant to the core issue in this case: do Plaintiffs have superior title to the Painting? Whether the National Gallery profited from any catalogues sold that included images of the Painting or from the loan of the Painting may be relevant to determining disgorgement for Plaintiffs' unjust enrichment claim, but the amount of any required disgorgement is ancillary to the primary issue—whether Plaintiffs have superior title to the Painting.

Likewise, the refusal letter is not core to the suit. The fact that the National Gallery sent a letter to Plaintiffs' counsel in New York refusing to return the Painting does not bear on whether Plaintiffs have superior title to the Painting, nor does it bear on whether the National Gallery has wrongfully retained the Painting. The alleged harmful conduct—retaining the Painting in derogation of Plaintiffs' request—is occurring in London, where the National Gallery keeps the Painting. The refusal letter is merely additional evidence that the National Gallery is knowingly and intentionally retaining the Painting, but it sheds no light on whether the National

Gallery is *wrongfully* retaining the Painting. To the extent that refusal is a substantive element of Plaintiffs' conversion and replevin claims,[13] "the mere fact that [the refusal letter] would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that [refusal] for purposes of § 1605(a)(2)." *Sachs*, 136 S. Ct. at 395; *see also id.* at 396 (explaining that *Saudi Arabia*, 507 U.S. 349, "is flatly incompatible with a one-element approach"). Moreover, a holding that would, effectively, allow any plaintiff to manufacture jurisdiction under the commercial activity exception by prompting foreign sovereigns to respond to demand letters sent by U.S. counsel would undercut Congress's intent to "specif[y] 'certain types of cases'" in which a foreign sovereign would not have immunity. *See Garb*, 440 F.3d at 586 (quoting *Sugarman v. Aeromexico*, Inc., 626 F.2d 270, 274 (3d Cir. 1980)). .

In short, the commercial activity exception does not apply to establish jurisdiction over the National Gallery and Great Britain.

### D. Waiver Exception

Section 1605(a)(1) of FSIA provides that a foreign state is not immune from jurisdiction if it "has waived its immunity either explicitly or by implication . . . ." 28 U.S.C. § 1605(a)(1). "[I]t is well-settled that a waiver of sovereign immunity must be clear, complete, unambiguous, and unmistakable in order to be effective." *Aquinda v. Texaco, Inc.*, 175 F.R.D. 50, 52 (S.D.N.Y. 1997) (collecting cases), *vacated on other grounds sub nom. Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998). Even as to implicit waivers, "[f]ederal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be construed

---

[13] "Under New York law an innocent purchaser of stolen goods becomes a wrongdoer only after refusing the owner's demand for their return[,]"and "[u]ntil the refusal the purchaser is considered to be in lawful possession." *Kunstsammlungen Zu Weimar v. Elicofon*, 678 F.2d 1150, 1161 (2d Cir. 1982). In other words, "demand and refusal are requisite elements of the cause of action" for replevin and conversion if defendant is a good faith purchaser. *Id.* The Court does not address whether Plaintiffs have adequately alleged that the National Gallery was a good faith purchaser, an issue the parties dispute.

narrowly." *Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d

317, 325 (2d Cir. 1993) (collecting cases). This approach, as the Second Circuit has explained,

is derived from the legislative history of FSIA. *Id.* For example, the House Report states:

> With respect to implicit waivers, the courts have found such waivers in cases where a
> foreign state has agreed to arbitration in another country or where a foreign state has
> agreed that the law of a particular country should govern a contract. An implicit waiver
> would also include a situation where a foreign state has filed a responsive pleading in an
> action without raising the defense of sovereign immunity.

*Id.* (citing H.R. Rep. No. 14-1487, at 18, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617). "These

examples involve circumstances in which the waiver was unmistakable, and courts have been

reluctant to find an implied waiver where the circumstances were not similarly unambiguous."

*Id.* (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991)).

Plaintiffs argue that Great Britain and the National Gallery have waived sovereign

immunity because Great Britain is a signatory to the UNESCO Convention on the Means of

Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural

Property 1970 ("UNESCO Convention"). Pls. Opp. 22-23. According to Plaintiffs, Article 13(c)

of the UNESCO Convention is a waiver of sovereign immunity because it provides that member

states agree "to admit actions for recovery of lost or stolen items of cultural property brought by

or on behalf of the rightful owners." UNESCO Convention, art. 13(c), 823 U.N.T.S. 231 (1972).

This language neither explicitly nor implicitly waives sovereign immunity. Nothing in

Article 13(c) suggests that member states agreed to subject themselves to suits in foreign states,

such as the United States, for recovery of lost or stolen cultural property. That member states

agreed to "admit actions for recovery of lost or stolen" cultural property does not signal an intent

to waive immunity in foreign courts, particularly because waivers must be "unmistakable." *See*

*Argentine Republic*, 488 U.S. at 442-43 (Argentina did not waive immunity "by signing an

international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States."); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 378 (7th Cir. 1985) (The Soviet Union did not waive immunity because the international agreements' language provided no "reason to conclude that the nations that are parties to these agreements anticipated when signing them that American courts would be the means by which the documents' provisions would be enforced."); *Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1104 (D.C. Cir. 1982) (Guinea did not waive immunity because the treaty did not foresee a role for United States courts in compelling arbitration even if the treaty provided that the arbitration would take place on U.S. soil.). In fact, Article 13(c) more fully provides that member states "undertake, *consistent with the laws of each State* . . . to admit actions for recovery of lost or stolen items . . . ." UNESCO Convention art. 13 (emphasis added). The fact that member states agreed to admit actions for recovery of lost or stolen items only to the extent doing so is consistent with their own domestic laws entirely cuts against the notion that by agreeing to Article 13(c) member states were agreeing to subject themselves to the laws of foreign states and the jurisdiction of foreign courts.

Thus, neither the expropriation, commercial activity, nor waiver exceptions apply to establish jurisdiction over the National Gallery and Great Britain. Plaintiffs' Amended Complaint is dismissed as to the National Gallery and Great Britain for lack of jurisdiction.[14] Even if the Court had jurisdiction, as explained below, Plaintiffs' claims would be time-barred. Plaintiffs' claims against the American Friends fail for that reason as well, and those claims are likewise dismissed.

---

[14] Great Britain raised additional arguments in support of its dismissal for lack of jurisdiction under FSIA, but the Court need not address those arguments given its ruling.

## II. Plaintiffs' Claims Are Time-Barred

### A. Legal Standard

In reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all of the non-movant's factual allegations as true and draws all reasonable inferences in the non-movant's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although all factual allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B. Statute of Limitations

The parties agree that Plaintiffs' claims are subject to CPLR 214(3), which provides that the statute of limitations for an action to recover a chattel or damages for the taking or detaining of a chattel is three years from the date of accrual.[15] *See* Gallery Defs. Mem. 31; Pls. Opp. 24. "The date of accrual depends on whether the current possessor is a good faith purchaser or bad

---

[15]  A three-year limitations period applies to conversion and replevin claims. N.Y. C.P.L.R. § 214(3); *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso*, 87 N.Y.2d 36, 44 (1995) (conversion); *Guggenheim Found. v. Lubell,* 77 N.Y.2d 311, 317-18 (1991) (replevin). Plaintiffs' declaratory judgment, unjust enrichment, and constructive trust claims, which are normally governed by a six-year limitations period pursuant to CPLR § 213(1), here are governed by a three-year limitations period because they sound in conversion. *See Kapernekas v. Brandhorst*, 638 F. Supp. 2d 426, 428 (S.D.N.Y. 2009) (applying a three-year limitations period to unjust enrichment and constructive trust claims because they "boil down to an allegation that defendant converted the art in question for his own benefit."); *see also Solnick v. Whalen*, 49 N.Y.2d 224, 229 (1980) ("In order to determine therefore whether there is in fact a limitation prescribed by law for a particular declaratory judgment action it is necessary to examine the substance of that action . . . . If that examination reveals that the rights of the parties sought to be stabilized in the action for declaratory relief are, or have been, open to resolution through a form of proceeding for which a specific limitation period is statutorily provided, then that period limits the time for commencement of the declaratory judgment action."); *Gold Sun Shipping Ltd. v. Ionian Transport Inc.,* 666 N.Y.S.2d 677, 678 (2d Dep't 1997) (because action "in reality[ ] sounded in conversion," plaintiff's additional claims for fraud, breach of fiduciary duty, and constructive trust were governed by a three-year statute of limitations).

faith possessor." *Swain v. Brown*, 24 N.Y.S.3d 598, 600 (1st Dep't 2016). "An action against a good faith purchaser accrues once the true owner makes a demand and is refused." *Id.* "By contrast, an action against a bad faith possessor begins to run immediately from the time of wrongful possession . . . ." *Id.* at 601. Thus, if the National Gallery is a good faith purchaser, Plaintiffs' claims accrued when the National Gallery refused to return the Painting; if the National Gallery is a bad faith purchaser, Plaintiffs' claims accrued when National Gallery purchased the Painting in 1979. The Gallery Defendants argue that Plaintiffs have implicitly alleged that the National Gallery was a bad faith purchaser, Gallery Defs. Mem. 33, whereas Plaintiffs argue that they have alleged that the National Gallery was a good faith purchaser, Pls. Opp. 24. The Court need not resolve this dispute because even if the National Gallery is a good faith purchaser, Plaintiffs' claims are time-barred.

Plaintiffs allege that the statute of limitations began to run on September 21, 2015, the date on which the National Gallery sent a letter to Plaintiffs' counsel refusing to return the Painting. Pls. Opp. 24; Am. Compl. ¶ 66. Plaintiffs commenced this action on September 6, 2016, which is within three years of that letter. Gallery Defendants argue, however, that this suit is not timely because the statute of limitations began to run on November 15, 2012, the date on which the National Gallery first refused Plaintiffs' demand in a letter not explicitly mentioned in Plaintiffs' Amended Complaint. Gallery Defs. Mem. 33-36.

Plaintiffs' counsel and the National Gallery began corresponding regarding the Painting on March 9, 2011, when Plaintiffs' counsel wrote to inquire about the provenance of the Painting. Declaration of Sarah E. André in Support of Motion to Dismiss ("André Decl. I") Ex. 8 (Dkt. 29-8). A series of letters followed. In those letters, the National Gallery and Plaintiffs' counsel exchanged information regarding the Painting, and Plaintiffs' counsel claimed that the

National Gallery did not have good title to the Painting.  *See* André Decl. I Exs. 1, 2, 9, 10, 11, 12 (Dkts. 29-1, 29-2, 29-9, 29-110, 29-11, 29-12).  On November 15, 2012, the National Gallery responded, explaining that, contrary to Plaintiffs' contentions, the Gallery had good title to the Painting and had conducted reasonable due diligence when it purchased the Painting.  André Decl. I Ex. 13 (Dkt. 29-13).  The letter concluded by formally rejecting Plaintiffs' claim to the Painting:

> You will gather from what I have said that we do not believe that any claim for reparation from the Gallery could be justified as a matter of law or on ethical grounds. . . . I am and my colleagues are grateful for the manner in which this claim has been pursued.  We have no doubt that our conclusion will be a great disappointment to the family.  I hope that they will accept that we have given serious consideration to their case and that a line may now be drawn under the claim.

*Id.* at 3-4.

Plaintiffs argue that the Court cannot consider the November 15, 2012 letter in resolving the motions to dismiss because it is outside the scope of their Amended Complaint.  Pls. Opp. 24-26.  On a motion to dismiss, the Court may consider, *inter alia*, "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).  Plaintiffs possessed and knew about the November 15 letter—as well as other correspondence between the National Gallery and Plaintiffs' counsel in 2011 and 2012—because they indisputably received the letter.  Pls. Opp.  26.  In an obvious tactical move, Plaintiffs fail to mention the November 15 letter in their Amended Complaint, but they do allege—without specifying when—that "Plaintiffs informed the National Gallery of the theft of the Painting, and the National Gallery refused to return it, even though Plaintiffs pointed them to documents proving the theft which were in the National Gallery's own archives . . . ."  Am. Compl. ¶ 61.  This passage clearly refers to the correspondence between Plaintiffs and the National Gallery in 2011 and 2012, including the

November 15 letter in which the National Gallery clearly rejected Plaintiffs' claim, as it summarizes the contents of those letters. The timing of events alleged in the Amended Complaint also indicates that this passage refers to the correspondence in 2011 and 2012. In their Amended Complaint, Plaintiffs allege that "[a]fter prolonged discussions with the National Gallery," Plaintiffs filed a claim with SAP in March 2014, and after SAP determined that it lacked jurisdiction, Plaintiffs' counsel demanded the return of the Painting on April 27, 2015. *Id.* ¶¶ 63-65. The "prolonged discussions" that took place before Plaintiffs filed a claim with SAP in 2014 necessarily includes the 2011 and 2012 correspondence. Accordingly, although Plaintiffs purposefully failed to identify specifically the November 15 letter in their Amended Complaint, they relied on it, and therefore the Court may consider it.

Plaintiffs argue that even if the Court can consider the November 15 letter, the letter is ambiguous, and the subsequent actions of the parties belie the conclusion that it constituted a refusal. Pls. Opp. 26-27. The standard for what constitutes a refusal, however, is generous. "[A] refusal need not use the specific word 'refuse' so long as it clearly conveys an intent to interfere with the demander's possession or use of his property." *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 588 (S.D.N.Y. 2015) (quoting *Feld v. Feld*, 720 N.Y.S.2d 35, 37 (2001)). "If either the recipient's words or actions evidences [sic] 'an intent to interfere with the demander's possession or use of his property,' . . . then the demand has been refused and the cause of action accrues, even if the words 'I refuse your demand' were not explicitly used." *Id.* (quoting *Grosz v. Museum of Modern Art*, 772 F. Supp. 2d 473, 483-84 (S.D.N.Y. 2010), *aff'd*, 403 F. App'x 575 (2d Cir. 2010)). The National Gallery clearly refused Plaintiffs' demand when it stated in its November 15 letter that it does "not believe that any claim for reparation from the Gallery could be justified as a matter of law or on ethical grounds" and that the Gallery has "no

doubt that our conclusion will be a great disappointment" but that it "hope[s] that [Plaintiffs] will accept that we have given serious consideration to their case and that a line may now be drawn under the claim." André Decl. I Ex. 13, at 3-4. Indeed, the National Gallery's September 21, 2015 refusal letter, which Plaintiffs allege is the actual refusal, is clearly simply a reiteration of the Gallery's November 15, 2012 refusal as it states that "the Board's position . . . *has been and remains that*, if a claim were brought . . . in relation to this Painting, they would . . . defend it." Am. Compl. Ex. D, at 2 (Dkt. 17-4) (emphasis added).

Plaintiffs further contend that the November 15 letter was not a refusal because a "hope" "that a line may now be drawn under the claim" merely expresses a desire to conclude the matter without actually concluding it, and this language, coupled with the parties' continued discussion of the matter, further indicates that the letter was not a refusal. Pls. Opp. 26-27. The use of "hope" does not obfuscate the Gallery's clear communication that it had concluded that it would not return the Painting. The November 15 letter point by point rejects Plaintiffs' arguments in favor of the Painting's return. *See generally* André Decl. I Ex. 13. The letter acknowledges that the Gallery has "no doubt that our *conclusion* will be a great disappointment to the family"—the conclusion being the Gallery's rejection of Plaintiffs' claim. *Id.* at 4 (emphasis added). Moreover, the letter does not invite additional correspondence regarding the Painting, ending instead with the quintessentially British statement that the Gallery hopes "a line may now be drawn under the claim." *Id.* Later actions of the Gallery to be courteous to Plaintiffs—meeting with Plaintiffs' counsel and responding to additional letters—does not restart the limitations period. *Grosz*, 772 F. Supp. 2d at 494 ("An aggrieved owner of property cannot delay the accrual of his cause of action for conversion indefinitely by eliciting multiple rejections from the person who is interfering with his right to possession. And once his claim accrues, the clock

does not reset to zero every time the parties reopen the subject of who owns the disputed property.").[16]

Lastly, on the issue of the statute of limitations, Plaintiffs argue that even if this Court considers the November 2012 letter to have been a refusal so that their claims accrued at that time, the statute of limitations was equitably tolled for a period of one year and ten days while Plaintiffs filed an administrative claim with SAP. Pls. Opp. 27. "As a general matter, a litigant seeking equitable tolling must establish two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010) (quoting *Lawrence v. Florida*, 549 U.S. 327, 336 (2007)). "[E]quitable tolling is only appropriate in rare and exceptional circumstances, . . . in which a party is prevented in some extraordinary way from exercising his rights." *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003), *as amended* (July 29, 2003) (alterations, internal quotation marks, and citations omitted).

Plaintiffs contend that the statute of limitations was equitably tolled because they were required to exhaust their remedies in Great Britain prior to filing suit in New York. Pls. Opp. 28. Regardless of whether that is true, Plaintiffs have not shown that they have pursued their rights diligently. Plaintiffs' ancestor acknowledged that she learned that the Painting was at the

---

[16] Plaintiffs' claims are also time-barred because the National Gallery openly treated the Painting as its own. "New York has not required a demand and refusal for the accrual of a conversion claim against a possessor who openly deals with the property as its own." *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 183 (2d Cir. 2000); *see also Wallace Wood Properties, LLC v. Wood*, 669 F. App'x 33, 34 (2d Cir. 2016), *as amended* (Nov. 17, 2016) (summary order) (citing *Songbyrd*, 206 F.3d at 183). The National Gallery has publicly displayed the Painting as part of its own collection, obviating the demand and refusal requirement. *See, e.g.*, Am. Compl. Ex. E, at 8 (PDF pagination) (listing the Painting as belonging to the "Trustees of the National Gallery, London" and "[f]ormerly collection Oskar and Greta Moll") (Dkt. 17-5). Accordingly, the limitations period began at the latest when Plaintiffs were aware that the National Gallery had the Painting, which had occurred at least by the late 1970s or early 1980s.

National Gallery as of the late 1970s or early 1980s. André Decl. I Ex. 1, at 5.[17] Although Plaintiffs' ancestors may have been "overwhelmed by the thought of a possible lawsuit with an uncertain outcome since [their] mother, the only witness, had already passed away," *id.*, being overwhelmed by the prospect of bringing a lawsuit is not a rare and extraordinary circumstance that warrants equitable tolling. Plaintiffs' cause of action may not have accrued until the National Gallery's refusal in November 2012 (assuming the Gallery was a good faith purchaser), but Plaintiffs did not diligently pursue their rights to the Painting given that they knew as of the late 1970s or early 1980s that the National Gallery owned the Painting, which they believed had been stolen from Greta Moll. For these reasons, Plaintiffs' claims are untimely.

### C. Laches

Finally, Plaintiffs' claims are barred by the doctrine of laches. The affirmative defense of laches is generally not appropriately raised on a motion to dismiss, but "when the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999). Moreover, "when the suit is brought after the statutory time has elapsed," as is the case here, "the burden is on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) (quoting *Leonick v. Jones & Laughlin Steel Corp.*, 258 F.2d 48, 50 (2d Cir. 1958)).

"Laches is based on the maxim . . . 'equity aids the vigilant, not those who sleep on their rights.'" *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998) (quoting *Ivani Contracting*

---

[17] The cited exhibit is a letter from Plaintiffs' counsel to the National Gallery dated September 10, 2012. It includes a declaration by Brigitte Würtz, daughter of Greta Moll and mother of Plaintiff Iris Filmer, regarding the provenance of the Painting. Würtz, who was 98 years old at the time the Amended Complaint was filed, assigned her 50% share of Greta Moll's estate to her daughter, Plaintiff Iris Filmer. Am. Compl. ¶ 15.

*Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997)). Laches "is an equitable defense

that 'bars a plaintiff's . . . claim where he is guilty of unreasonable and inexcusable delay that

has resulted in prejudice to the defendant.'" *Id.* (quoting *Ivani Contracting Corp.*, 103 F.3d at

259). "[T]he doctrine of laches, unlike a statute of limitations, does not depend on whether 'a

certain definite time has elapsed since the cause of action accrued, but whether, under all the

circumstances of the particular case, plaintiff is chargeable with a want of due diligence' in

asserting its rights." *Astra USA, Inc. v. Bildman*, 375 F. App'x 129, 133 (2d Cir. 2010) (quoting

*McIntire v. Pryor*, 173 U.S. 38, 59 (1899)).

Laches bars a plaintiff's claim when: (1) the plaintiff was aware of the claim; (2) the

plaintiff inexcusably delayed in taking action; and (3) the delay prejudiced the defendant.

*Ikelionwu*, 150 F.3d at 237. All the elements for laches are satisfied in this case. First, there is

no question that Plaintiffs were aware of their claim to the Painting; they knew it had been

stolen. Djamarani confessed to Greta Moll that she had used the Painting as collateral to get a

loan from the Swiss gallery, and Greta Moll had relayed this information to her daughter.[18]

André Decl. I Ex. 1, at 4. Moreover, Greta Moll explained in a 1954 lecture and in a 1956 essay

that she and her husband had "lost" the Painting after World War II. Am. Compl. ¶ 61. There is

also no question that Plaintiffs inexcusably delayed taking action to recover the Painting.

Plaintiffs have known for decades that the National Gallery possessed the painting. As explained

above, Plaintiffs' ancestor acknowledged that she learned that the Painting was at the National

---

[18]       In the context of deciding whether laches bars a claim for lost or stolen artwork or cultural artifacts,
determining whether a plaintiff was adequately diligent in attempting to locate the property "focuses not only on
efforts by the party to the action, but also on efforts by the party's family." *Bakalar v. Vavra*, 819 F. Supp. 2d 293,
303 (S.D.N.Y. 2011) (quoting *Bakalar v. Vavra*, No. 05 CIV. 3037 (WHP), 2006 WL 2311113, at *3 (S.D.N.Y.
Aug. 10, 2006)), *aff'd*, 500 F. App'x 6 (2d Cir. 2012); *see also Sanchez v. Trs. of the Univ. of Pa.*, No. 04 CIV. 1253
(JSR), 2005 WL 94847, at *2-3 (S.D.N.Y. Jan. 18, 2004) (considering lack of effort made by plaintiffs' father and
grandfather); *Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.*, 752 N.Y.S.2d 295, 297 (2002) (noting
absence of inquiries by family over time).

Gallery as of the late 1970s or early 1980s. André Decl. I Ex. 1, at 5. In a 1992 news article, Plaintiffs' other ancestor was photographed at the National Gallery next to the Painting, and she was quoted in the article regarding the Painting. André Decl. I Ex. 5, at 6.[19] Despite their knowledge of the Painting's whereabouts, Plaintiffs took no steps to recover the Painting until Plaintiffs' counsel began corresponding with the National Gallery in 2011.[20]

As to the last element, prejudice to the defendant, "[i]t is self-evident that the passing of time will almost inevitably be prejudicial to any defendant," *LaGares v. Good Commander Shipping Co.*, 487 F. Supp. 1243, 1245 (S.D.N.Y. 1980), and in this case, a significant amount of time—decades—has passed since the Painting was allegedly stolen and since the National Gallery acquired the Painting. The delay is likely to make it difficult for the Defendants "to garner evidence to vindicate [their] rights." *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, No. 98 CIV. 7664 (KMW), 1999 WL 673347, at *10 (S.D.N.Y. Aug. 30, 1999) (citation omitted). Many individuals involved in the alleged post-war conversion and the National Gallery's acquisition of the Painting are likely deceased, unavailable, or not *compos mentis*, and even if they are alive and of sound mind, they likely suffer from faded memories, "making it extremely difficult for [D]efendants to establish either that the [Painting] was not stolen or that they conducted a vigilant effort to make sure the transaction was legally

---

[19] This 1992 news article was attached to Plaintiffs' counsel's August 7, 2015 letter to the National Gallery. The Court considers this letter in deciding Defendants' motions to dismiss for the reasons described *supra*.

[20] Plaintiffs argue they did not unreasonably delay in demanding the return of the Painting because: (1) the English statute of limitations barred their claims before the National Gallery acquired the Painting; (2) a British law barred the deaccession of artworks from the National Gallery; and (3) Plaintiffs could not sue in the United States until *Altmann v. Republic of Austria*, 317 F.3d 954, 958 (9th Cir. 2002), which was the first case to hold that FSIA's expropriation exception applied retroactively, was decided in 2002. Pls. Opp. 30-31. Even if this is all true, it does not explain why Plaintiffs failed to contact the National Gallery regarding the Painting years earlier, file an administrative claim with SAP years earlier, or sue in the United States in the decade after *Altmann* was decided.

appropriate."[21] *Sanchez,* 2005 WL 94847, at *3. Because the statute of limitations period has passed, it is Plaintiffs' burden to show that it would be inequitable to apply laches. *Conopco, Inc.*, 95 F.3d at 191. Plaintiffs have neither alleged nor shown that Defendants have not been prejudiced by their delay in bringing this case.

In sum, Plaintiffs have not met their burden to show that it would be inequitable to apply laches in this case, and it is clear Plaintiffs cannot prove any set of facts to avoid laches.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted, and Plaintiffs' Amended Complaint is dismissed with prejudice. The Court does not grant Plaintiffs leave to amend because they have not indicated that they are aware of other facts or that they could develop other facts that would suffice to establish jurisdiction pursuant to FSIA. Moreover, even if Plaintiffs could allege such facts, their claims are time-barred. The Clerk of Court is respectfully directed to terminate the open motions at docket entries 28 and 38 and to close the case.

**SO ORDERED.**

**Date: September 21, 2017**
      **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

---

[21]     Plaintiffs argue, relying on *Deweerth v. Baldinger*, 804 F. Supp. 539, 554 (S.D.N.Y. 1992), *rev'd*, 38 F.3d 1266 (2d Cir. 1994), that Defendants are not prejudiced because presumably none of the unavailable witnesses or evidence would have been in favor or Defendants. Pls. Opp. 31. On what basis Plaintiffs make this presumption is unclear; it appears to be completely unfounded.